JjARMSTRONG, Judge.
This ease involves an alleged breach of contract for the sale of natural gas. Specifically, the seller, DeNovo Oil and Gas Corporation (formerly named GoldKing Production Company), alleges that the buyer, Louisiana Intrastate Gas Corporation (hereinafter “LIG”), failed to pay to De Novo certain amounts allegedly due as reimbursement for the cost of construction of a pipeline used to deliver gas to LIG. In the trial court, LIG raised three defenses based on Louisiana state law: (1) that LIG had in fact paid all amounts due as reimbursement for the pipeline construction cost; (2) that certain amendments to the contract, in effect, eliminated the amounts to be paid as reimbursement for the pipeline construction cost; and (3) that no claim could be made for at least some of the amounts allegedly due because of a provision in the contract requiring that claims for alleged undercharges must be made within twenty-four months. LIG also raised in the trial court a defense that, as a matter of federal law, payment of the amounts allegedly due for reimbursement of pipeline construction costs would violate the federal Natural Gas Policy Act or “NGPA”. The trial court rejected LIG’s three state law defenses, expressly declined to consider the NGPA defense (which it believed should be directed to the Federal Energy Regulatory commission or “FERC”), and rendered a money judgment against LIG and in favor of DeNovo. We find that' the trial court was correct as to its’ disposition of LIG’s first |2two state law defenses. As to LIG’s third state law defense, we find that the trial court *360 erred in part and we must remand for recalculation of damages. As to LIG’s federal NGPA defense, we agree with the trial court that this issue first should be considered by FERC rather than the trial court (or this court). On remand the federal NGPA issue can be referred to FERC for decision.
DeNovo and LIG signed the gas sale contract on November 1, 1977. Item 3 of that contract, captioned “Price”, provided for an initial price as well as for changes to the contract price to be made under various circumstances. Most important for present purposes is paragraph (f) of Item 3 which provides that, in the event the gas sold under the contract becomes subject to federal price control, the price will be the maximum price allowed under the federal price control.
Should any state or federal law, rule or regulation establish a ceiling price for the gas sold under this Contract, then in such event, Seller shall receive the maximum price allowed by such law, rule or regulation. It shall be the responsibility of Seller to notify Buyer of any such law, rule or regulation permitting a price higher than that being paid hereunder, and such new established price shall become effective on the effective date of such Federal law, rule or regulation, if Seller notifies Buyer within thirty (30) days after such effective date. If notice is not received by Buyer within thirty (30) days of such effective date, then the price shall become effective upon receipt of the Seller’s notice by Buyer, (emphasis added).
A separate Item of the contract, Item 2, captioned “Point of Delivery”, provided for arrangements for the physical delivery of the gas by DeNovo to LIG. Most important for present purposes is paragraph (b) of Item 2 which provides for construction of a pipeline for delivery of the gas and, in the event DeNovo rather than LIG builds the pipeline, the paragraph provides for reimbursement to DeNovo for the pipeline construction costs:
Subject to the further provisions of this Item 2(b), Buyer agrees to promptly construct, or arrange for construction of, the facilities necessary to receive the gas from Seller at each respective, mutually agreeable delivery point, and, upon the completion of each such facility, to commence taking such gas at the earliest possible date. Seller may, however, at its option proceed with the construction of the facilities required to deliver gas committed hereunder to a mutually agreeable location on Buyer’s pipeline facilities. In the event of construction by Seller, Buyer shall pay Seller fifteen cents (15) per MCF of gas produced from such source until Seller’s actual costs of pipeline | ^construction is recouped. Seller shall consult with Buyer on and shall set a maximum amount of money to be reimbursed for each separate occasion when Seller elects to construct the facilities for delivery of gas from any source hereunder. It is the basic intent of Buyer and Seller that Buyer shall lay the necessary pipeline facilities in order to accept delivery of gas at each mutually agreeable delivery point. In the event Buyer does not elect to lay such line, Seller shall have the option, but not the obligation to lay such line. If neither Buyer nor Seller elect to construct said line, then such gas that would other wise be delivered to Buyer at such delivery point shall not become subject to this contract.
DeNovo built the pipeline for delivery of the gas to LIG and commenced delivery of gas on March 23, 1978. Until January, 1979, the price paid by LIG pursuant to Item 3 (hereinafter the “Item 3 Price”) was one dollar, and eighty cents per mmBtu and, in addition, the pipeline construction cost of fifteen cents per Mcf was paid pursuant to Item 2(b) (hereinafter the “Item 2(b) Reimbursement”).[1]
*361 On November 9,1978, after delivery of gas had been underway for some months, the federal NGPA was enacted. The federal NGPA included a “maximum lawful price” or “mlp” for the sale of gas which mlp was applicable to the gas sold by DeNovo to LIG under the contract at issue as of December 1, 1978. The mlp was higher than the Item 3 price then being charged under the contract. (Paragraph (f) of Item 3 makes no distinction as to whether the mlp is higher or lower than the previous Item 3 Price.)
Pursuant to paragraph (f) of Item 3 of the contract, which is quoted in full above, De Novo sent a December 29, 1978 letter that notified LIG that the higher Item 3 price, i.e. equal to the mlp, was now applicable. There is no dispute that DeNovo was entitled to, and apparently was paid, the mlp in accordance with paragraph (f) of Item 3. It also is Uundisputed that the December 29, 1978 De Novo letter to LIG was received on January 2, 1979 and that the use of the mlp therefore became applicable on January 2, 1979.
At first, the application of the mlp had no effect on the parties’ handling of the Item 2(b) Reimbursement. LIG paid DeNovo the mlp plus the fifteen cents per Mef Item 2(b) Reimbursement. However, in January of 1980, FERC issued its order No. 68 which dealt with certain aspects of the NGPA including certain aspects of the mlp. In particular, FERC’s Order No. 68 stated:
We believe that the word “price” in the phrase “contract price” as well as the phrase “price under the terms of the existing contract” [as used in the NGPA with regard to the mlp] means the total amount of proceeds paid by the purchaser to obtain the subject gas. Therefore, the term “price” would include all proceeds paid or payable to the seller even if specifically earmarked as reimbursement for state severance taxes or production related costs. (emphasis added).
On April 10, 1980, LIG’s counsel rendered an opinion letter to LIG which opined that payment of the Item 2(b) Reimbursement,
“in addition to” the mlp, violated the NGPA as interpreted in FERC’s Order No. 68. In other words, the opinion was that it would be unlawful for DeNovo to receive, or for LIG to pay, the mlp plus the Item 2(b) Reimbursement. This opinion was furnished to DeNovo and, by letter of August 19, ■ 1980, DeNovo concurred that it would not be proper for LIG to continue paying the mlp plus the Item 2(b) Reimbursement and concurred that LIG should stop paying the Item 2(b) Reimbursement. As LIG had paid DeNovo the Item 2(b) Reimbursement from January 1979 through July 1980, DeNovo refunded to LIG the total amount of the Item 2(b) Reimbursement that had been paid during that period (which was $338,401.20). LIG, of course, ceased paying the fifteen cents per Mcf Item 2(b) Reimbursement and paid only the mlp. DeNovo’s and LIG’s view of FERC order No. 68 was reasonable and their actions were prudent.
Beginning in March, 1983, De Novo and LIG executed a series of letter agreement amendments to the contract which reduced the “price” for the gas. Several of the earlier letter agreement amendments stated in pertinent part:
|fi[E]ffective at normal chart changing time [on a specified date] the total price to be paid for all gas delivered ... shall be [a specified dollar amount] per MMBtu’s inclusive of taxes.
The later letter agreement amendments stated, in pertinent part:
Seller and Buyer hereby mutually agree that effective at normal chart changing time on [a specified date] and continuing until [a specified date] the price for all gas delivered shall be [a specified dollar amount] per MMBtu, inclusive of all taxes and other adjustments, measured on a wet Btu basis.
A key point, which is not in dispute, is that these letter agreement amendments to the contract reduced the “price” for the gas to a level sufficiently below the mlp that payment *362 of the “price” set by the letter agreement amendments plus the Item 2(b) Reimbursement would not violate the NGPA as interpreted by FERC Order No. 68.
DeNovo and LIG, by mutual agreement, terminated the contract effective December 31, 1987.
One event is FERC’s Order No. 94-B which was issued on January 24, 1983. This is of some significance because, arguably, that order overruled those aspects of the earlier FERC Order, No. 68 quoted above, which the parties believed forbid the charging of the Item 2(b) Reimbursement in addition to the mlp. In other words, arguably, from the March 7, 1988 effective date of FERC Order no. 94-B (that order was made prospective only by FERC), it was lawful for the Item 2(b) Reimbursement to be charged in addition to the mlp. LIG concedes that “DeNovo arguably could have collected the fifteen cents price adjustment on top of ... the [mlp] from March 7,1983 forward for the balance of the [pipeline] construction cost[.]” (The previous two sentences assume that charging the Item 2(b) Reimbursement in addition to the mlp was illegal under FERC Order No. 68. We do not decide whether such a charge would in fact have been unlawful under federal law.) We note this point because, as we will discuss below, the parties may wish to raise issues related to FERC Order No. 94-B on remand in the trial court and/or before FERC.
On December 30, 1986, DeNovo invoiced LIG for the Item 2(b) Reimbursement for gas deliveries from April 1983 through October 1986. DeNovo’s cover letter with that invoice explained DeNovo’s position that, as of the March 1983 “price” reduction effected Isby the letter agreement amendments to the contract, the Item 2(b) Reimbursement would be charged once again, because that charge would no longer be unlawful:
On March 25,1983, the applicable price for sales under the contract was reduced significantly below the monthly ceiling prices published pursuant to the Natural Gas Policy Act rules. The 15fl: per MCF reimbursement is claimed for months subsequent to the date of the price reduction.
The amount of the December 30, 1988 invoice was the full $1,538,715.00 cost of constructing the pipe line. There appears to be no dispute that the December 30, 1986 invoice was inaccurate in that it failed to credit LIG with $202,018.10 in Item 2(b) Reimbursement that had been paid to DeNovo in 1978 prior to the January 1979 increase of the Item 3 price to the mlp limit. (Unlike the Item 2(b) Reimbursement paid by LIG from January 1979 to July 1980, the Item 2(b) Reimbursement payments made prior to January 1979 were not refunded by DeNovo to LIG.) However, LIG objected to making any payment on the invoice, giving several reasons, some of which are now the issues discussed below, and DeNovo filed suit in trial court.
LIG responded to DeNovo’s suit by raising several Louisiana state law defenses and a federal law defense under the NGPA. De-Novo moved in the trial court to stay the case while it petitioned FERC to address the federal NGPA defense. The trial court granted that motion, over LIG’s opposition, and ordered the case stayed while DeNovo and LIG proceeded before FERC. The trial court found that LIG’s federal NGPA defense was “raised under a federal statute which is within the jurisdiction of FERC to interpret and enforce” and that “FERC is far better qualified to determine” the issues under the NGPA raised by LIG’s federal NGPA defense. We have reviewed FERC Orders No. 68, and No. 94-B and LIG’s arguments as to why its payment of the Item 2(b) Reimbursement sought by DeNovo would violate the NGPA, and we concur fully in the trial court’s view that it would be best if LIG’s federal NGPA defense is addressed by FERC rather than the trial court (or this court). See generally Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475, 489 (La.1991) (on rehearing) (Court has discretion to allow agency with specialized expertise to first determine issues).
17However, LIG moved to dismiss DeNo-vo’s petition before FERC and FERC did so dismiss. The key point to FERC’s decision, as we appreciate it, is that the trial court might rule in LIG’s favor on LIG’s Louisiana state law defenses with the result that LIG *363 might be absolved from all liability as a matter of state law and, in that situation, it would not be necessary to ever address LIG’s federal NGPA defense at all. Also, FERC’s decision suggests that, once LIG’s Louisiana state law defenses are resolved, if LIG’s federal NGPA defense still is a live issue, then FERC would address LIG’s federal NGPA defense at that time.
After FERC’s dismissal of DeNovo’s petition, DeNovo moved the trial court to lift the stay as to the Louisiana state law issues but leave the stay in place as to LIG’s federal NGPA defense. LIG moved the trial court to lift the stay in its entirety. The trial court granted DeNovo’s motion and denied LIG’s motion and lifted the stay as to LIG’s Louisiana state law defenses while leaving it in place as to LIG’s federal NGPA defense. Because, as we have discussed above, we believe it would be best if LIG’s federal NGPA defense is first addressed by FERC rather than the trial court (or this court), and because FERC’s decision dismissing DeNo-vo’s petition indicates a willingness by FERC to consider LIG’s federal NGPA defense if that is still a live issue once LIG’s Louisiana state law defenses are resolved, we fully agree with the trial court’s decision to leave the stay in place as to LIG’s federal NGPA defense while proceeding with LIG’s Louisiana state law defenses.
LIG then filed a motion for partial summary judgment based upon a provision in the contract which limits claims for undercharges to a period of twenty-four months prior to the discovery of the undercharges. DeNovo responded with a cross-motion for summary judgment as to all of LIG’s Louisiana state law defenses. The trial court granted both LIG’s motion for partial summary judgment and DeNovo’s motion for summary judgment and left the stay in place as to LIG’s federal NGPA defense. Some confusion ensued as to the effect of the trial court’s granting of LIG’s motion for partial summary judgment and DeNovo filed a motion for clarification of the trial court’s decision. The trial court granted DeNovo’s motion and clarified its previous decision by means of additional written reasons for judgment which made clear that the granting of LIG’s motion for partial summary I ¿judgment, and the trial court’s consequent application of the contractual twenty-four months limitation on claims for undercharges to DeNovo’s claim, barred only a portion of DeNovo’s claim and did not result in a complete bar as to DeNovo’s claim. The trial court also entered a money judgment in favor of DeNovo and against LIG in accordance with its additional written reasons for judgment. Lastly, that judgment and the additional written reasons for judgment lifted the stay as to LIG’s federal NGPA defense but did not address the merits of that defense.
LIG filed a motion for reconsideration based, at least in part, on the argument that the trial court had granted a final judgment against LIG when it was clear that one of LIG’s defenses, the federal NGPA defense, had never been considered on the merits by the trial court (or FERC). The trial court denied that motion for reconsideration. LIG suspensively appealed.
I
The first of LIG’s state law defenses which it urges upon appeal is that LIG already has paid the total Item 2(b) Reimbursement and that the judgment in DeNo-vo’s favor amounts to double recovery. Most simply stated, it is LIG’s position that the fifteen cents per mcf Item 2(b) Reimbursement was included in the amounts paid (and not refunded by DeNovo) from January 2, 1979, when the Item 3 Price was increased to the mlp by operation of paragraph (f) of Item 3, to March 1983, when the letter agreements reduced the “price” for the gas below the mlp. In effect, LIG argues that, when it was paying for gas an amount per MMBtu which was equal to the mlp, then a portion of that amount paid by LIG, equal to fifteen cents per mcf of the gas delivered, must be credited against LIG’s Item 2(b) Reimbursement obligation. LIG maintains that the trial court erred in failing to so credit LIG. We disagree and hold that the trial court reached the right result as to this point.
The contract imposed two separate financial obligations on LIG. One was to pay DeNovo for the gas itself and this was addressed by Item 3 of the contract which, *364 logically enough, was captioned “price”. LIG’s other financial obligation was to reimburse DeNovo for the construction of a pipeline to deliver the gas to LIG and was addressed by paragraph (b) of Item 2, which Item is captioned “Delivery Point”. The very fact that |9LIG’s two financial obligations are addressed by two different Items of the contract is strongly indicative that those two financial obligations operate independently of one another.
Also, LIG’s two financial obligations are measured differently. The Item 3 Price is measured by a dollar amount per MMBtu— i.e., a dollar amount paid for a specific amount of energy delivered. The Item 2(b) Reimbursement is measured by a dollar amount per mcf — i.e., a dollar amount paid for a specific volume of gas delivered. Perhaps it would be possible to determine the mcf (volume) of gas that made up a particular month’s MMBtu (energy) so as to calculate the credit that LIG proposes, but the complete absence of any reference to such an accounting gymnastic in the detailed, lengthy (82 pages) and obviously carefully drafted contract precludes the possibility that the credit LIG proposes was contemplated by the parties as any part of the contract. In other words, if the parties intended for any part of the MMBtu-measured Item 3 Price payments to be applied to the mef-measured Item 2(b) Reimbursement obligation when paragraph (f) of Item 3 raised the Item 3 price to the mlp, then some reference to or provision for the MMBtu to mcf conversion would have been included in the contract.
Moreover, Item 2(b) did not require that DeNovo, as opposed to LIG, build the pipeline. Indeed, Item 2(b) states that: “It is the basic intent of Buyer [LIG] and Seller [DeNovo] that Buyer [LIG] shall lay the necessary pipeline ... ”. DeNovo had the option to build the pipeline if LIG failed to do so. If LIG had built the pipeline, the result would have been that DeNovo would receive the full mlp pursuant to paragraph (f) of Item 3 without bearing the cost of constructing the pipeline. The contract’s provision for the Item 2 Reimbursement obviously was intended to achieve the same ultimate economic result, DeNovo not bearing the cost of constructing the pipeline, when DeNovo exercised the option to build the pipeline itself. (Of course, full reimbursement would depend upon a sufficient volume of gas being delivered so that fifteen cents multiplied by the number of mcf delivered would equal the pipeline construction cost.) That obvious purpose of the Item 2(b) Reimbursement provision would be defeated by the credit proposed by LIG because such a credit would result in DeNovo ultimately bearing the cost of construction of the pipeline. If it was the contractual intent to so jettison the obvious purpose of the Item Im2(b) Reimbursement when the Item 3 Price was changed to the mlp by operation of paragraph (f) of Item 3, then surely there would be some express provision in the contract for such a result.
Most importantly, the plain reading of the contract does not include the credit that LIG proposes. Quite simply, the contract contains a provision for the Item 3 Price, including the paragraph (f) provision for the Item 3 Price to be changed to the mlp, and another provision for the Item 2(b) Reimbursement, and no indication that a payment of one obligation, no matter what amount, can be substituted for the other obligation. There is no doubt that the contract calls for payment of the mlp, when paragraph (f) of Item 3 operates, plus the full Item 2(b) Reimbursement. This is how the parties themselves both understood the contract because, from January 1979, when operation of paragraph (f) of Item 3 changed the Item 3 Price to the mlp, the mlp plus the Item 2(b) Reimbursement was paid. It was only when LIG’s counsel opined that, under FERC Order No. 68, it would be unlawful to pay the mlp plus the Item 2(b) Reimbursement, that the parties altered their conduct. Also, the correspondence of the parties and LIG’s counsel in the spring and summer of 1980 (as opposed to the contentions of LIG when the present dispute arose in December 1986) shows that both parties regarded the change made to comply with FERC Order No. 68 as consisting of a cessation of payments for the Item 2(b) Reimbursement. In other words, both parties believed that the Item 3 Price, which was now set at the mlp, was being paid and that the Item 2(b) Reimbursement was not being paid at all. None of the correspon- *365 denee says that the Item 2(b) Reimbursement was somehow being included in the Item 3 Price payments.
We conclude that, for the period from January 2,1979 to March 1983, none of the Item 2(b) Reimbursement has been paid. (Of course, from January 2, 1979 to July 1980, the Item 2(b) Reimbursement was paid but it was refunded by DeNovo to LIG.)
II
LIG also argues that the letter agreement amendments to the contract starting in March, 1983 set new contract “prices” which included within such new “prices” the Item 2(b) Reimbursement. In other words, LIG contends that it is intended by the letter agreement amendments to the contract that only the “price” set out in them will be paid | nand that the Item 2(b) Reimbursement will not be paid. We disagree for several reasons. First, and most obvious, neither form of the letter agreements, the pertinent portions of which are quoted above, makes any reference whatsoever to the Item 2(b) Reimbursement. Second, both forms of the letter agreements purport to alter the “price” for the gas. As we have discussed in section I above, the contract deals with the price of the gas itself as a matter separate and distinct from the reimbursement for pipeline construction costs. In fact, the contract deals with the price for the gas itself in Item 3, captioned “Price”, and deals with pipeline construction costs in a separate Item, Item 2. Third, the letter agreement amendments express the new prices in a dollar amount per MMBtu as with the contract’s Item 3 Price and unlike the contract’s Item 2(b) Reimbursement which is expressed in terms of a dollar amount per mcf. We have discussed above the differences between MMBtu and mcf, and the letter agreement amendments’ use of the MMBtu measure links them with Item 3 of the contract and disassociates them from Item 2(b) of the contract. In short, the letter agreement amendments affected only Item 3 of the contract and not Item 2(b).
LIG argues that the later forms of the letter agreements (although not the earlier forms) state that the new “price” is “inclusive of all taxes and any other adjustments” to the price. But, as we have discussed at length above, the Item 2(b) Reimbursement is an obligation separate and independent from the Item 3 price to be paid for the gas itself, and the two obligations are measured differently. Also, Item 2(b) does not ever use the word “adjustment”. For these reasons, as well as those set out in the preceding paragraph, we do not believe that the Item 2(b) Reimbursement is an “adjustment” to the price referred to in the letter agreements.
Instead, we believe that the “adjustments” referred to in the letter agreements are certain price changes provided for in Item 3. The contract is divided into three parts (although it is all assembled as a single document). The first part is a twelve-page main body of the contract which is divided into six sections, each of which is referred to as an “Item” in the table of contents of the main body. Item 3, as we have discussed, is captioned “Price”. The second part of the contract is a twenty-four page “Exhibit A” which is divided into thirteen “Articles”. The third part of the contract is a forty-five page | ^“Exhibit B” which is divided into eight groups of schedules of gas leases or plats of portions of gas leases. Each of the eight groups of the third part of the contract is preceded by a page with a statement that, for the gas covered by that group, “the initial base price shall be [a specified dollar amount] per MMBtu, subject to the other provisions of Item 3 and Article IV-A of Exhibit ‘A’, from initial delivery of said gas until the price is adjusted according to the other provision of Item 3”. (emphasis added).
Turning to Item 3 in the main body of the contract, captioned “Price”, one does not find the word “adjust” or any of its derivatives. However, virtually the entire text of Item 3 is devoted to the circumstances under which prices for gas will be changed and how those changes will be made. Item 3’s paragraph (a) provides for prices to “escalate” on a schedule, its paragraph (b) provides for prices to be “redetermined”, its paragraph (c) discusses prices being “computed” from the average of other prices, its paragraph (d) discusses “renegotiation” of prices, its paragraph (e) provides for “the parties to meet *366 and mutually agree and determine the price” and, of course, its paragraph (f) provides for the price to become the mlp. Exhibit B uses the verb “adjusted” to refer generically to all these various mechanisms of Item 8 for changing the price of the gas. We believe the word “adjustments” in the letter agreement amendments to the contract is used in an identical fashion — to refer to the various methods for changing the price provided for in Item 3. This interpretation, in light of the use of the word “adjusted” in Exhibit B to the contract, is, at the least, certainly more appropriate than LIG’s argument that the word “adjustments” in the letter agreement amendments includes the Item 2(b) Reimbursement.
Ill
LIG argues that DeNovo’s claim for the Item 2(b) Reimbursement is barred in its’ entirety by the contract’s twenty-four month limitation on retroactive adjustments for undercharges or overcharges. Paragraph (b) of Article IX-A of Exhibit “A” of the contract provides:
If any overcharge or undercharge in any form whatsoever shall at any time be found and the amount thereof has been paid, Seller shall refund the amount of the overcharge received by Seller and Buyer shall pay the amount of the undercharge within thirty (30) days after final determination thereof, provided, however, no retroactive adjustment will be made for any overage or underage which | ^occurred twenty-four (24) months prior to the date such overage or underage is discovered.
The trial court implicitly took the position that the “undercharge” of the Item 2(b) Reimbursement was discovered as of the December 30, 1986 date of the invoice for the Item 2(b) Reimbursement sent by DeNovo to LIG. Both parties, and in particular LIG, appear to accept that “discovery” date.
Consequently, the trial court held that De-Novo could make no claims for the Item 2(b) Reimbursement for gas produced prior to December 30, 1984 (i.e., more than twenty-four months prior to December 30, 1986). The trial court allowed DeNovo the fifteen cents per mef Item 2(b) Reimbursement on gas produced from December 30, 1984 to the December 31, 1987 termination of the contract. The result was that DeNovo did not recover quite all of the outstanding amount of the pipeline construction cost as the amount of gas delivered between December 30, 1984 and December 31, 1987 was not quite enough, at fifteen cents per mcf, to equal the outstanding balance of the Item 2(b) Reimbursement.
LIG argues that application of the twenty-four month limitation should result in a complete bar of DeNovo’s claim. LIG’s reasoning is that there was an “undercharge”, by the non-payment of the Item 2(b) Reimbursement, from January 2, 1979 through December 30, 1986. Further, LIG reasons, the “undercharge” from January 2, 1979 through December 30, 1984 was in an amount exceeding the outstanding balance of the pipeline construction cost. In other words, LIG argues that there was enough gas delivered from January 2, 1979 to December 30, 1984, which was all more than twenty-four months prior to the December 30,1986 invoice date, that at fifteen cents per mcf the entire Item 2(b) Reimbursement obligation would have been paid prior to December 30, 1984 if the fifteen cents per mef had in fact been charged.
We reject LIG’s position because we do not believe there was an “undercharge” during the period January 2, 1979 through March, 1983. It will be recalled that, pursuant to paragraph (f) of Item 3, the Item 3 Price was increased to the mlp and, according to both parties’ reasonable understanding of FERC Order No. 68, the Item 2(b) Reimbursement could not be charged or paid. It will also be recalled that this state of | ^affairs changed in March 1983 when the Item 3 Price was reduced by the letter agreement amendments to a level below the mlp so that the Item 2(b) Reimbursement could be charged. (Also, FERC Order No. 94-B became effective in March 1983 and, arguably, it permitted charging the mlp plus the item 2(b) Reimbursement.) Either the parties were correct and FERC Order No. 68 made it unlawful, i.e. impossible, to charge the Item 2(b) Reimbursement from January 2, 1979 to March 1983 or the parties were *367 incorrect in that regard but their understanding of FERC Order No. 63 was so reasonable that it was, as a practical matter, impossible to charge the Item 2(b) Reimbursement. In either such circumstance, it was impossible for the Item 2(b) Reimbursement to be charged, so there was no “undercharge” by the failure to charge it.
In March, 1983, it became possible once again to charge the Item 2(b) Reimbursement and the failure to charge it until December 30, 1986 did constitute an “undercharge”. For that portion of this undercharge which was more than twenty-four months prior to the December 30, 1986 invoice date (i.e. from March 1983 to December 30, 1984) DeNovo’s claim is time-barred.
Thus, the recoverable amount of DeNovo’s claim should be calculated as follows. From the total amount of the pipeline construction cost, $1,538,715, there first must be deducted the amount of Item 2(b) Reimbursement paid by LIG in 1970, $202,018.10, which leaves an unpaid balance of $1,336,696.90. From that unpaid balance there must be deducted the amount of the time-barred Item 2(b) undercharge for the period March 1983 through December 30, 1984 (i.e. fifteen cents per mcf for gas delivered from March 1983 through December 30, 1984) with the remainder being the recoverable amount of Item 2(b) Reimbursement. The trial court did not do this second deduction and that omission requires a remand for recalculation of the damages.
Thus, on remand, the trial court must determine, or the parties stipulate, the amount of the time-barred undercharge at the rate of fifteen cents per mcf on the volume of gas delivered from March 1983 through December 30,1984. Then, the amount of that time-barred undercharge must be deducted from the unpaid balance of $1,336,696.90. After that deduction is made, the remainder will be the recoverable amount of Item 2(b) Reimbursement.
I mDeNovo should be awarded damages calculated as fifteen cents per mcf on the volume of gas delivered from December 30, 1984 through the December 31, 1987 termination of the contract but the total of those damages may not exceed the recoverable amount calculated in accordance with the above-given directions.
LIG contends that, because the trial court did not hold the lack of Item 2(b) Reimbursement payments from January 2, 1979 through December 30, 1984 to constitute time-barred undercharges, the trial court “changed the due date” on the Item 2(b) Reimbursement. We have agreed with LIG only to the extent that we have held the lack of Item 2(b) Reimbursement payments from March 1983 through December 1984 to be time-barred undercharges. Thus, to the extent we have held that the lack of Item 2(b) payments from January 2, 1979 through March 1983 did not constitute “undercharges,” LIG’s criticism of judicial “changing of the due date” on the Item 2(b) Reimbursement is as easily directed at our decision as at the trial court’s decision.
It is not altogether incorrect to characterize our decision as “changing the due date” on the Item 2(b) Reimbursement but we believe that is what is necessary in order to effectuate as much as possible of the clear contractual intent under the peculiar factual circumstances of it being at first impossible, but then later possible, to charge the Item 2(b) Reimbursement. The essence of LIG’s position is that Item 2(b) calls for the Item 2(b) Reimbursement to be paid on, and only on, the first 10,258,100 mcf of gas delivered (i.e. 10,258,100 mcf x 15$ = $1,538,715.00 which was the pipeline construction cost. As LIG sees it, if the Item 2(b) Reimbursement is not paid in its entirety on the first 10,258,-100 mcf of gas delivered, because it would have been unlawful to pay Item 2(b) Reimbursement on most of the first 10,258,100 mcf of gas delivered, then the unpaid balance of the Item 2(b) Reimbursement is simply eliminated.
DeNovo counters LIG’s argument by pointing out that nowhere in Item 2(b) is there any express requirement that the Item 2(b) Reimbursement be paid only on the first 10,258,100 mcf of gas delivered. DeNovo is correct that there is no such express requirement.
The exact language of Item 2(b) which is directly relevant is the sentence: “In the event of construction [of the pipeline] by *368 Seller [DeNovo], Buyer [LIG] shall pay Seller |i6[DeNovo] fifteen cents (15$) per mcf of gas produced from such source until Seller’s [DeNovo’s] actual cost of pipeline construction is recouped.” Despite the lack of any express requirement that the Item 2(b) Reimbursement will be paid on the first 10,258,-100 mcf of gas delivered, the most natural reading of the just-quoted sentence is that, in the ordinary course of the performance of the contract (i.e. if things go as expected and intended) the Item 2(b) Reimbursement payments will begin with the first delivery of gas and continue uninterrupted so long as gas continues to be delivered until the entire pipeline construction cost is recouped by DeNovo.
Of course, things did not go as intended or expected. The contract contemplated that, with the operation of paragraph (f) of Item 3, both the mlp and the Item 2(b) Reimbursement would be paid. FERC Order No. 68 prevented that ordinary course of performance of the contract. The real issue is this: If, in view of the fact that the parties intended and expected that the entire pipeline construction cost would be recouped by DeNovo by the Item 2(b) Reimbursement (subject only to a sufficient total quantity of gas being delivered so that the total mcf of gas delivered multiplied by 15<t would equal the pipeline construction cost and that is not an issue here), is it a better construction and application of the contract to hold that the temporary impossibility of charging the Item 2(b) Reimbursement eliminated the obligation to pay the Item 2(b) Reimbursement or, instead, merely delayed performance of the obligation to pay the Item 2(b) Reimbursement? With the question so stated, we believe the correct answer is obvious. It more closely conforms to the contractual intent to hold that the temporary impossibility of charging the Item 2(b) Reimbursement resulted only in a delay in the time for performance of the obligation to pay the Item 2(b) Reimbursement and not in an elimination of that obligation. The point is to carry out the contractual intent as well as possible in an unexpected situation, and to completely eliminate a substantial financial obligation would be a far greater departure from the contractual intent than a delay in the performance of that obligation. This reasoning is reinforced by the absence of any express requirement in Item 2(b) that the Item 2(b) Reimbursement be paid on the first 10,258,100 mcf of gas delivered. Because of the absence of any such express requirement, there is no conflict between our reasoning and any express provision of the contract.
JjjLIG has argued that payment of the unpaid balance of the Item 2(b) Reimbursement would constitute a circumvention of the federal NGPA or would otherwise be unlawful under the federal NGPA. LIG’s federal NGPA defense is a difficult one because the proper application of the federal NGPA to the present situation is far from obvious and probably requires the consideration of a number of federal natural gas policies with which neither we nor the trial court are familiar. The contrast between FERC’s Order No. 68 on the one hand, and FERC’s later Order No. 94-B on the other hand, and the lengthy discussion in Order No. 94-B, shows how difficult and policy-sensitive are issues connected with the mlp established by the NGPA.
LIG argues on appeal that the trial court should not subject LIG to a final judgment when LIG’s federal NGPA defense never had been considered on the merits by either the trial court or FERC. However, we have determined to remand for a recalculation of the damages, and on remand, LIG’s federal NGPA defense can be referred to FERC. On remand, the trial court may stay its judgment as to LIG’s federal NAPA defense while one or both of the parties apply to FERC for determination of LIG’s federal NGPA defense. If FERC determines LIG’s federal NGPA defense on the merits, then the trial court should give FERC’s determination whatever binding and/or persuasive effect is appropriate under the law (an issue we do not address in this opinion) and conduct any additional proceedings it may find necessary or useful prior to lifting any stay on the judgment.
LIG argues that the trial court erred by awarding DeNovo interest on each monthly installment of the Item 2(b) Reimbursement from the date that each monthly installment *369 was due. LIG argues that interest should not begin to run until much later when De-Novo rendered a “correct invoice” to LIG as to the amounts due. DeNovo responds that, under Article 2000 of the Louisiana Civil Code, interest is payable on an obligation for payment of money from the date that payment “is due” and that, under the contract, the Item 2(b) Reimbursement was to be paid monthly.
Both parties have invoked paragraph (a) of Article IX-A of Exhibit “A” of the contract which states, in pertinent part:
lisOn or before the 25th day of each month after deliveries of gas are commenced, Buyer shall render a statement to Seller for the preceding month, properly identified as to the delivery location, showing the daily and total volume of gas delivered hereunder during the preceding month, together with a cheek for the amount due therefor and with information sufficient to explain and support any adjustments made by Buyer in determining the amount due. If the correct amount is not paid within 10 days of the due date, interest on any unpaid amount shall accrue at the rate set as the prime rate by the First City National Bank in Houston, Texas, per annum.
We do not see this issue as one of legal interest or as implicating the legal rules about when payment “is due” within the meaning of Article 2000 of the Louisiana Civil Code. The contract itself provides for interest, the times at which interest will begin to run and the rate of interest. Thus, a contractual interest provision is applicable rather than legal interest.
The contract provides that, for each month’s gas delivery the payment is due by the 25th day of the following month and interest begins to run on that payment ten days after the due date. Thus, for example, the Item 2(b) Reimbursement payment for gas delivered in April, 1983 was due May 25, 1988 and interest began to run ten days after May 25,1983. Because we have determined, in Section III above, that it will be necessary to remand to the trial court for a recalculation of damages, we note that the trial court will have to recalculate the interest on the damages as well.

CONCLUSION

To sum up, we have held as follows. The trial court’s determination that the Item 2(b) Reimbursement had not already been paid in full is correct. The trial court’s determination that the letter agreement amendments to the contract do not apply to the Item 2(b) Reimbursement, and instead apply to the Item 3 Price, is correct. The trial court’s application of the twenty-four month limit of paragraph (b) of Article IX-A of Exhibit “A” is not entirely correct and a remand is necessary for a recalculation of damages. The trial court’s determination that LIG’s federal NGPA defense first should be addressed by FERC is correct. Interest on the damages must be recalculated on remand, in accordance with paragraph (a) of Article IX-A of Exhibit “A”.
hsFor the foregoing reasons, the judgment of the trial court is affirmed in part and the case is REMANDED for further proceedings in accordance with this opinion.
AFFIRMED IN PART, REMANDED IN PART.

. The term "MMBtu” is an abbreviation for the phrase "one million British thermal units” and is a measure of energy. Thus, the Item 3 Price, which is the amount paid for the gas itself, is measured by the energy content of, the gas delivered rather than by the volume of gas delivered. As shown by LIG documents in the record, the energy content of the gas delivered by DeNovo to LIG was not uniform but, instead, fluctuated from time to time. We appreciate an analogy to the purchase of gasoline. One pays more per gallon for higher-octane premium gasoline than for lower-octane regular gasoline. In contrast, the Schedule of the Item 2(b) Reimbursement is measured by "Mcf”, which is an abbreviation of the phrase "thousand cubic feet,” and a measure *361 of volume rather than energy content. The total amount of the Item 2(b) Reimbursement is limited to DeNovo’s pipeline construction costs which amount, assuming total delivery of a sufficient volume of gas, would he paid in full over a period of time determined by the speed at which the gas is delivered.